. Luis **JUSINO MERCADO, et al.,**
**Plaintiffs, Appellants,**

v.

**COMMONWEALTH OF PUERTO RICO, et al., Defendants, Appellees.**

**Carlos Vega Castro, et al., Plaintiffs, Appellants,**

v.

**Commonwealth of Puerto Rico, et al., Defendants, Appellees.**

**Nos. 99–1584, 99–1661.**

United States Court of Appeals, First Circuit.

Heard March 8, 2000.

Decided May 31, 2000.

Michael T. Leibig, with whom Carla M. Siegel and Zwerdling, Paul, Leibig, Kahn, Thompson & Wolly, P.C., were on brief, for appellants.

Gustavo A. Gelpi, Solicitor General, with whom Edda Serrano–Blasini, Deputy So-licitor General, Leticia Casalduc–Rabell and Irene S. Soroeta–Kodesh, Assistant Solicitors General, were on brief, for appellees.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and LIPEZ, Circuit Judge.

SELYA, Circuit Judge.

Spurred by the Supreme Court's changing explication of Eleventh Amendment jurisprudence, we recently determined that a non-consenting state cannot be sued in a federal venue by public employees who seek to enforce the penalty provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 201–219 (FLSA). *See Mills v. Maine,* 118 F.3d 37, 49 (1st Cir.1997); *accord Abril v. Virginia,* 145 F.3d 182, 185–86 (4th Cir.1998) (collecting similar cases). This result was compelled by the Court's decision in *Seminole Tribe v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).[1] The instant appeals raise a somewhat different—and more nuanced—question: does that selfsame prohibition extend to suits brought by public employees against Puerto Rico, notwithstanding Congress's plenary power over territories and possessions? We hold that, absent further congressional action, Puerto Rico, like the fifty states, is immune from federal damages actions brought by individuals under the FLSA.

## I. TRAVEL OF THE CASE

On May 15, 1998, two separate groups of public employees—one composed of police officers and the other composed of correc-

---

1. Withal, many courts have ruled that Congress validly abrogated states' sovereign immunity in the Equal Pay Act (which is part of the FLSA). *See, e.g., Hundertmark v. Florida Dep't of Transp.,* 205 F.3d 1272, 1277 (11th Cir.2000); *Ussery v. Louisiana,* 150 F.3d 431, 437 (5th Cir.1998), *cert. dismissed,* 526 U.S. 1013, 119 S.Ct. 1161, 143 L.Ed.2d 225 (1999); *Timmer v. Michigan Dep't of Commerce,* 104 F.3d 833, 842 (6th Cir.1997). We do not comment on that question, except to note that the Supreme Court recently has granted certiorari in two cases of this genre, vacating the decisions and remanding for further consideration in light of *Kimel v. Florida Bd. of Regents,* —— U.S. ——, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). *See State Univ. of N.Y., College at New Paltz v. Anderson,* —— U.S. ——, 120 S.Ct. 929, 145 L.Ed.2d 807 (2000), *vacating* 169 F.3d 117 (2d Cir.1999); *Illinois State Univ. v. Varner,* —— U.S. ——, 120 S.Ct. 928, 145 L.Ed.2d 806 (2000), *vacating* 150 F.3d 706 (7th Cir.1998).

tional officers—filed class action complaints in the United States District Court for the District of Puerto Rico. Each suit named the Commonwealth of Puerto Rico and various commonwealth entities (hereinafter collectively Puerto Rico) as defendants and sought overtime pay, liquidated damages, and kindred relief arising out of alleged FLSA violations.[2] Mindful that this court long had held that Puerto Rico enjoys the benefit of Eleventh Amendment immunity, *see, e.g., Torres v. Puerto Rico Tourism Co.,* 175 F.3d 1, 3 (1st Cir.1999); *Ramirez v. Puerto Rico Fire Serv.,* 715 F.2d 694, 697 (1st Cir.1983); *Fernandez v. Chardon,* 681 F.2d 42, 59 n. 13 (1st Cir. 1982), the defendants moved to dismiss both suits. In each instance, the district court obliged. *See Jusino Mercado v. Puerto Rico,* Civ. No. 98–1536 (D.P.R. Mar. 23, 1999); *Vega Castro v. Puerto Rico,* 43 F.Supp.2d 186 (D.P.R.1999). Both sets of plaintiffs appealed and we consolidated the cases.

## II. THE APPELLANTS' ARGUMENT

The appellants advance an arresting argument. They claim that the Supreme Court's decisions in *Seminole Tribe* and its progeny have made it pellucid that the rationale behind Eleventh Amendment immunity hinges upon the constitutional bargain in which states joined the Union but retained their inherent sovereignty. Although that bargain circumscribes the federal government's authority, it is specific to the states; thus, the appellants reason, it cannot insulate other entities (like Puerto Rico).

An historical overview may help to place this sophisticated argument into perspective. For many years, the Supreme Court fostered the impression that Congress could authorize individuals to sue states in federal courts pursuant to the exercise of its plenary powers under Article I, as long as it signaled its intention clearly enough.

*See, e.g., Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 19–20, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989) (plurality opinion) (arguing that Congress's plenary power under the Commerce Clause would be incomplete without the power to render the states liable in damages); *Employees v. Department of Pub. Health & Welfare,* 411 U.S. 279, 284–85, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973) (stating that Congress can legislate if it concludes that "national policy" dictates an elevation of state employees' economic status, but that "Congress, acting responsibly, would not be presumed to take such action silently"); *see also Welch v. Texas Dep't of Highways & Pub. Transp.,* 483 U.S. 468, 475–76 & n. 5, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987) (assuming the point arguendo). In these cases, the Supreme Court interpreted the Eleventh Amendment more as an acknowledgment that states retained common-law sovereign immunity over matters not specifically addressed by the Constitution than as an absolute protection of states' sovereign immunity generally. *See, e.g., Union Gas,* 491 U.S. at 19–20, 109 S.Ct. 2273; *see also* Herbert Hovenkamp, *Judicial Restraint and Constitutional Federalism: The Supreme Court's Lopez and Seminole Tribe Decisions,* 96 Colum. L.Rev. 2213, 2245 (1996).

In *Seminole Tribe,* the Court abandoned this well-trodden path and insisted upon a two-step inquiry to determine whether a federal statute effectively trumped a state's Eleventh Amendment protections. It asked first whether Congress unequivocally had declared an intent to abrogate the states' immunity and then asked whether the attempted abrogation occurred pursuant to a constitutional clause that entails the power to abrogate. *See Seminole Tribe,* 517 U.S. at 55, 116 S.Ct. 1114. In the statute at issue there (which concerned gaming on Indian reservations), Congress had made no secret of its inten-

---

**2.** The suits also proffered pendent claims under Puerto Rico law. Because the viability of these claims in a federal forum depends on the viability of the plaintiffs' FLSA claims, we abjure any further mention of them.

tion to override the states' immunity, but it had acted under the Indian Commerce Clause, U.S. Const. art. I, § 8, cl. 3. As a result, the Court found the law's attempted abrogation of immunity invalid. *See id.* at 72–73, 116 S.Ct. 1114. In reaching this conclusion, the Court held flatly that Congress could not subdue the states' sovereign immunity in furtherance of its Article I powers, no matter how emphatically it stamped its foot. *See id.*

■■■ This holding represented a sea change in prevailing Eleventh Amendment jurisprudence. The Court not only negated its earlier assumption that Congress could abrogate states' sovereign immunity in pursuance of Article I as long as it expressed its intent to do so with sufficient clarity, but also overruled *Union Gas. See id.* at 66, 116 S.Ct. 1114. In the process, the Court repudiated the notion that "to the extent that the States gave Congress the authority to regulate commerce, they also relinquished their immunity where Congress found it necessary, in exercising this authority, to render them liable." *Union Gas,* 491 U.S. at 19–20, 109 S.Ct. 2273. It posited instead that the states retained their immunity when the original constitutional bargain was struck (citing the Eleventh Amendment as a confirmation of that fact). *See Seminole Tribe,* 517 U.S. at 64, 116 S.Ct. 1114; *see also Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 2256, 144 L.Ed.2d 636 (1999) ("Although the sovereign immunity of the States derives at least in part from the common-law tradition, the structure and history of the Constitution make clear that the immunity exists today by constitutional design."). In short, *Seminole Tribe* signifies that when Article I is the only applicable wellspring of congressional authority, the Eleventh Amendment precludes Congress from allowing individuals to sue non-consenting states in federal court.[3] *See Kimel v. Florida Bd. of Regents,* —— U.S. ——, 120 S.Ct. 631, 643–44, 145 L.Ed.2d 522 (2000).

Building on this foundation, the appellants argue that the district court should have allowed their FLSA suits to go forward. In their view, the first part of the *Seminole Tribe* test—intent—is satisfied here because, in enacting the FLSA, Congress unmistakably expressed its intention to pierce the shield of the states' immunity, *see Mills,* 118 F.3d at 42, and did so in a way that enveloped Puerto Rico, *see* 29 U.S.C. § 203(c).

The second part of the *Seminole Tribe* test—validity—is fulfilled, the appellants asseverate, because Puerto Rico was not a party to the constitutional bargain that protects the states' immunity from overreaching exercises of Congress's Article I powers. Although it may be reasonable to say that the states did not surrender their sovereign immunity when they pledged fealty to a document that included the Commerce Clause, the appellants reject such a claim regarding Puerto Rico. Puerto Rico is a territory, not a state, and in their view, the Territorial Clause gives Congress plenary power to do whatever it deems useful in respect to the territories (including the abrogation of their sovereign immunity). *See* U.S. Const. art. IV, § 3, cl. 2 (investing Congress with the power to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States"). Consequently, the appellants' thesis runs, the FLSA's intended abrogation of sovereign immunity, though impuissant as to the states by virtue of the Eleventh Amendment, has force as to Puerto Rico.

Despite the syllogistic ease of this thesis, there is a rather large fly in the ointment. Puerto Rico became an American

---

**3.** In contrast, enforcement of the Fourteenth Amendment is an exception to the Eleventh Amendment restriction because the states deliberately surrendered some of their extant Eleventh Amendment rights of sovereignty in agreeing to the adoption of the Fourteenth Amendment. For this reason, Congress still can abrogate the states' immunity in furtherance of its powers under the Fourteenth Amendment. *See Seminole Tribe,* 517 U.S. at 65–66, 116 S.Ct. 1114.

dependency in 1898, and the Supreme Court recognized its common-law sovereign immunity almost immediately thereafter. *See Porto Rico v. Rosaly Y Castillo,* 227 U.S. 270, 273, 33 S.Ct. 352, 57 L.Ed. 507 (1913). Congress subsequently gave the people of Puerto Rico a substantial measure of autonomy over their own affairs. *See Rodriguez v. Popular Democratic Party,* 457 U.S. 1, 8, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982). This special treatment crested in 1953 when Puerto Rico gained the option (promptly exercised) of drafting its own constitution, to take effect after being adopted by the people and approved by Congress. *See* 48 U.S.C. §§ 731b–731e. This overture was "in the nature of a compact" and, when accepted, guaranteed "a republican form of government" for the island. *Id.* §§ 731b–731c; *see generally Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 671–73, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974). Since that time, we consistently have held that Puerto Rico's sovereign immunity in federal courts parallels the states' Eleventh Amendment immunity. *See, e.g., Ortiz–Feliciano v. Toledo–Davila,* 175 F.3d 37, 39 (1st Cir.1999); *Torres,* 175 F.3d at 3; *Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct & Sewer Auth.,* 991 F.2d 935, 939 n. 3 (1st Cir.1993); *De Leon Lopez v. Corporacion Insular de Seguros,* 931 F.2d 116, 121 (1st Cir.1991); *Fred v. Roque,* 916 F.2d 37, 38 (1st Cir.1990); *Ramirez,* 715 F.2d at 697; *Fernandez,* 681 F.2d at 59 n. 13; *Ezratty v. Puerto Rico,* 648 F.2d 770, 776 n. 7 (1st Cir.1981). The appellants' thesis that Puerto Rico is unlike the states for Eleventh Amendment purposes clashes head-on with this phalanx of cases.

The appellants justify this seeming disregard for precedent by pointing out that the vast majority of those cases were de-cided before *Seminole Tribe* and signified only that Congress could not abrogate Puerto Rico's immunity without a clear statement of intent (a rule with which they do not quibble).[4] Later cases, the appellants assert, represent an overly wooden application of principles of *stare decisis,* repeating by rote the rule announced in earlier cases without recognizing the doctrinal shift that *Seminole Tribe* heralded and without considering the Territorial Clause as a possible source of Congress's power to abrogate Puerto Rico's immunity. They are, therefore, relics of a past that has no present relevance.

## III. ANALYSIS

Having fairly developed the appellants' argument, we take its measure.

The FLSA's enforcement provision provides explicitly for individuals' suits against public agencies. *See* 29 U.S.C. § 216(b) ("An action to recover the liability prescribed [hereunder] may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction...."). Moreover, the FLSA defines the term "public agency" to mean "the Government of the United States; the government of a State or political subdivision thereof; any agency of [any of the above]; or any interstate governmental agency." 29 U.S.C. § 203(x). For this purpose, " 'State' means any State of the United States or the District of Columbia or any Territory or possession of the United States." 29 U.S.C. § 203(c). Congress obviously intended this language to override the states' immunity, but it failed to achieve that goal because its power to regulate wages arises under Article I. *See Mills,* 118 F.3d at 48; *see generally Seminole Tribe,* 517 U.S. at 72–73, 116 S.Ct. 1114. The question nonetheless lin-

---

4. The appellants do not pause over what seems to be a logical inconsistency in their position. The clear statement rule is rooted in judicial reluctance to infer a shift in the "constitutionally mandated balance of power between the States and the Federal Government" without convincing evidence. *Atas-cadero State Hosp. v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1984) (citation and internal quotation marks omitted). On the appellants' theory, however, there is no constitutionally mandated balance as between Puerto Rico and the federal sovereign.

gers whether this language suffices to abrogate Puerto Rico's immunity.

The appellants' argument, which we have unfurled at some length, offers us a seemingly simple solution to this question: because Congress has plenary power in respect to territories and possessions under the Territorial Clause, there is at least an arguable basis for our treating Puerto Rico differently than the states (and, thus, for upholding the exercise of federal jurisdiction in these cases). But courts must guard against the seductive lure of deceptively simple solutions; and, if experience teaches us anything, it is that most legal inquiries that turn upon Puerto Rico's political status are complex. As the Supreme Court lamented a quarter-century ago, it is "frequently the case" when examining the text of a statute for its applicability to Puerto Rico that "the language is not free of ambiguity, the purposes appear to be diverse and sometimes contradictory, and the circumstances are not fully spread upon the record for our instruction." *Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 581, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976). So it is here.

■ Whether Puerto Rico is to be treated as a state or a territory for purposes of a particular statute that does not mention it specifically "depends upon the character and aim of the act." *Puerto Rico v. Shell Co.*, 302 U.S. 253, 258, 58 S.Ct. 167, 82 L.Ed. 235 (1937); *accord Cordova & Simonpietri Ins. Agency, Inc. v. Chase Manhattan Bank*, 649 F.2d 36, 38 (1st Cir.1981) (Breyer, J.). When the FLSA's enforcement provision was thought wholly valid, stripping away Puerto Rico's immunity fit comfortably within the act's design. We know now, however, that the FLSA does not divest the states' Eleventh Amendment immunity (and to that extent the enforcement provision is at least partially disabled). Seen in that light, the character of the statute has changed—and this development leaves open the issue whether the statute should be interpreted as abrogating Puerto Rico's sovereign immunity.

The Court's opinion in *Shell Company* furnishes an appropriate starting point as we struggle to resolve this issue. When determining a statute's applicability to Puerto Rico, we must construe the language, whenever possible, "to effectuate the intent of the lawmakers." *Shell Co.*, 302 U.S. at 258, 58 S.Ct. 167. In certain circumstances, Puerto Rico's changing status complicates this task. For example, the Supreme Court held in 1937 that treating Puerto Rico as a territory comported with congressional intent as evinced by the Sherman Act (a statute drafted before the United States acquired any insular dependencies). *See id.* at 259, 58 S.Ct. 167. Over four decades later, however, this court concluded that the passage of the Federal Relations Act, 48 U.S.C. § 731 *et seq.*, and the concomitant development of commonwealth status for the island, dictated an opposite result. *See Cordova & Simonpietri*, 649 F.2d at 42. We posed the critical question then in terms of "whether the Sherman Act's framers, if aware of Puerto Rico's current constitutional status, would have intended it to be treated as a 'state' or 'territory' under the Act." *Id.* at 39.

■ We believe that the situation at hand is analogous, and that the states' changing status relative to Puerto Rico plays a salient part in the interpretive calculus. Thus, we employ a similar methodology and ask today: Is it likely that the framers of the FLSA's enforcement provision would have intended the provision to include Puerto Rico had they foreseen the decision in *Seminole Tribe* and the resultant shift in the states' status? If so, the FLSA potentially should be construed to abrogate Puerto Rico's immunity; elsewise, it should not. *See Shell Co.*, 302 U.S. at 257, 58 S.Ct. 167; *Mora v. Mejias*, 206 F.2d 377, 387 (1st Cir.1953). This mode of analysis is not dissimilar to that adopted by the Supreme Court in deciding what portions of a statute may be saved when a

court has declared part of the law unconstitutional and Congress has not provided explicit guidance as to severability. *See, e.g., Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 684, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987) ("Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." (citation and internal quotation marks omitted)).

■ In approaching this interpretive problem, we recognize that a statute's "meaning in particular instances is to be arrived at not only by a consideration of the words themselves, but by considering, as well, the context, the purposes of the law, and the circumstances under which the words were employed." *Shell Co.,* 302 U.S. at 258, 58 S.Ct. 167. The *Calero–Toledo* Court seems to have used this approach in determining that Puerto Rico statutes were to be treated as "state statutes" within the purview of the Three–Judge Court Act because, given Puerto Rico's commonwealth status, it would serve the Act's goal of insulating a sovereign state's laws from unnecessary interference. *See* 416 U.S. at 670–75, 94 S.Ct. 2080; *see also Cordova & Simonpietri,* 649 F.2d at 42 (determining that the circumstances of Puerto Rico's commonwealth status indicated that the term "territory" in the Sherman Act did not include Puerto Rico).

So too in *Examining Board,* where the Justices employed the same approach in construing a statutory enforcement provision that gave federal courts jurisdiction over actions to redress deprivations effected "under color of any State law." *See* 426 U.S. at 580, 96 S.Ct. 2264. The Court decided that the phrase "State law" encompassed Puerto Rico law, and that the United States District Court for the District of Puerto Rico had jurisdiction over a claim that officials had effected deprivations under color of Puerto Rico law, notwithstanding the facial inapplicability of the enforcement provision. *See id.* at 597, 96 S.Ct. 2264. In so holding, the Court relied on broader wording contained in the statute's separately codified substantive component, 42 U.S.C. § 1983 (which prohibits deprivations of rights "under color of any statute . . . of any State or Territory"); the statute's legislative history (which did not suggest that the eventual cleaving of the substantive provision from the enforcement provision was designed to undo the statute's original enforceability in territorial courts); the fact that Congress had provided explicitly that federal law was to have the same effect in organized territories as elsewhere in the United States; the history of the district court's jurisdiction in Puerto Rico (which placed it pretty much on a par with courts in other districts); and Congress's avowed purpose to open the federal courts to section 1983 actions. *See id.* at 583–95, 96 S.Ct. 2264.

■ Despite the differing postures of the cases—in *Examining Board* the Court determined whether Congress, in creating an enforcement provision for section 1983 that was limited to cases regarding "[s]tate law," intended a special restriction on the jurisdiction of federal district courts vis-à-vis Puerto Rico, *see id.* at 583, 96 S.Ct. 2264, whereas here, on the appellants' reading, the FLSA's enforcement provision creates federal jurisdiction over individuals' suits against Puerto Rico but not against the states—we find *Examining Board* instructive. Applying the same mode of analysis to the FLSA's enforcement provision (and, indeed, relying on some of the same factors), we are unable to detect the slightest sign that Congress deliberately chose to fashion a dichotomy between enforcement against Puerto Rico on one hand, and enforcement against the states on the other hand. We thus hold that the drafters of the FLSA's abrogation language would not have included Puerto Rico, had they known they could not validly include the states. Three sets of considerations compel this holding.

For one thing, neither the language of the FLSA's enforcement provision nor the specific definitions provided by Congress suggest an intent to treat Puerto Rico and the states differently. To the contrary, Congress used the word "state" in an encompassing sense, agglomerating the states and the territories. *See* 29 U.S.C. § 203(c); *cf. Examining Bd.*, 426 U.S. at 583, 96 S.Ct. 2264 (relying on the common origin of the enforcement provision and a provision that treated state and territorial law equally). We give this great weight.

For another thing, when Congress amended the FLSA in 1974 to permit suits against "public agencies," it did not distinguish between its intended elimination of the states' and Puerto Rico's immunity. *See* Pub.L. 93–259, § 6(d)(1) (1974); *cf.* H.R.Rep. No. 93–913, at 45 (1974), *reprinted in* 1974 U.S.C.C.A.N. 2811, 2853 (explaining the amendments as making clear that "suits by public employees to recover unpaid wages and liquidated damages under such section may be maintained in a Federal or State court of competent jurisdiction"). This is particularly significant because other provisions of the FLSA show that when Congress intended to single out Puerto Rico, it knew how to do so. *See, e.g.*, 29 U.S.C. § 206(a)(2) (setting separate minimum wage requirements for home workers in Puerto Rico); Pub.L. 93–259, § 5 (1974) (instituting industry committees to set appropriate minimum wage rates for workers in Puerto Rico).

■ The sockdolager is that Congress wrote the FLSA's enforcement provision with full knowledge of Puerto Rico's unique commonwealth status. With that status, Congress hoped "to accord to Puerto Rico the degree of autonomy and independence normally associated with States of the Union." *Examining Bd.*, 426 U.S. at 594, 96 S.Ct. 2264. To further this aspiration, it decreed that "[t]he statutory laws of the United States not locally inapplicable, except as hereinbefore or hereinafter otherwise provided, shall have the same force and effect in Puerto Rico as in the United States...." 48 U.S.C. § 734. Thus, long before Congress enacted the relevant provision of the FLSA, it had put firmly in place a default rule: statutes of general application would apply equally to Puerto Rico and to the fifty states *unless* Congress made specific provision for differential treatment. It is a perfectly reasonable assumption that this rule of thumb informs Congress's intent going forward. Indeed, the Supreme Court relied on an earlier embodiment of it in normalizing the treatment of Puerto Rico to the treatment of the states when Congress had not explicitly indicated otherwise. *See Examining Bd.*, 426 U.S. at 585, 96 S.Ct. 2264.

For our purposes, this is important context. Given Congress's default rule—which was in effect when Congress amended the FLSA's enforcement provision in 1974 to make public employers liable, and remains so today—courts will not ordinarily construe statutes to treat Puerto Rico in one way and the states in another unless the language of a particular statute demands that result. *See* 48 U.S.C. § 734. We say "ordinarily" because we recognize the possibility that, on rare occasions, the existence of a compelling reason may prompt an inquiring court to read a statute, silent on the point, in a discriminating manner. *See Cordova & Simonpietri*, 649 F.2d at 42 (resting its holding in part on the absence of any "reason of policy discernible in the Sherman Act for treating Puerto Rico differently, given a general Congressional intent to grant Puerto Rico state-like autonomy"); *cf. Examining Bd.*, 426 U.S. at 594, 96 S.Ct. 2264 (declining, without "evidence in the legislative history that would support a determination that Congress intended" to treat Puerto Rico differently, to read a federal statute applicable to the states to exclude Puerto Rico). There are, therefore, two possible avenues to differential treatment: an express direction in the statutory text or some other compelling reason.

■ The first basis for an exception indubitably is absent here. That leaves the second. To satisfy this element here,

"there would have to be specific evidence or clear policy reasons embedded in a particular statute to demonstrate a statutory intent to intervene more extensively into the local affairs of post-Constitutional Puerto Rico than into the local affairs of a state." *Cordova & Simonpietri,* 649 F.2d at 42. This is not such a case. The record (including the arguments of the appellants' able counsel) offers nothing that would lead an objective observer to conclude that Congress, in extending the FLSA to permit suits against public agencies, meant either to encroach more extensively upon Puerto Rico's autonomy than upon the states' or to give commonwealth employees more rights than their counterparts in the fifty states. By the same token, the FLSA's legislative history explains the enforcement provision without any mention of special treatment for Puerto Rico. *See* H.R.Rep. No. 93–913, at 45 (1974), *reprinted in* 1974 U.S.C.C.A.N. 2811, 2853.

In fact, one portion of the legislative history indicates that Congress drafted provisions affecting the government of Puerto Rico only when the constraints of federalism would not prevent application of the same rules to state governments. After nonsupervisory public employees were brought under the FLSA's auspices and the Supreme Court finally held that this provision could apply to state employees, *see Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 555–56, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), Congress amended the law to make the minimum wage in Puerto Rico equivalent to that elsewhere.[5] The House Report explaining those amendments justified the application of the newly uniform minimum wage to government employees by saying that "[p]ublic employees in Puerto Rico and throughout the United States were brought under the protection of the FLSA by the Supreme Court's *Garcia* decision in 1985 and are subject to the provisions of the Fair Labor Standards Amendments of 1985." H.R.Rep. No. 101–260, at 23 (1989), *reprinted in* 1989 U.S.C.C.A.N. 696, 711. In our view, this language demonstrates that Congress subjected Puerto Rico's employees to the FLSA under the assumption that the same rules applied to Puerto Rico as to the states, or, to put it in more case-specific terms, that Congress did not intend the FLSA to affect employees of Puerto Rico when it could not affect state workers.

The best argument for a contrary result runs along the following lines.[6] Congress amended the FLSA's enforcement provision in 1974 in response to a Supreme Court opinion that held that the FLSA, as it then stood, did not adequately evince an intent to abrogate sovereign immunity. *See* H.R.Rep. No. 93–913, at 41 (1974), *reprinted in* 1974 U.S.C.C.A.N. 2811, 2850 (discussing *Employees,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251). Taking this bit of history in isolation, one can argue that the underlying purpose of the enforce-

**5.** Previously, Congress had not required employers in Puerto Rico (other than the federal government) to pay their employees the same minimum wage required of other employers. In 1974, it provided for committees to determine what minimum wage would be appropriate for each industry in the developing economy (including government work). *See* H.R.Rep. No. 93–913, at 23–25 (1974), *reprinted in* 1974 U.S.C.C.A.N. 2811, 2833–34. The aim was to plot a course for gradual progress toward parity with the minimum wage elsewhere in the United States. *See id.*

**6.** The appellants also could argue, we suppose, that the FLSA can abrogate Puerto Rico's immunity and still be deemed to have the same force and effect in Puerto Rico as in the United States because, even after *Seminole Tribe,* the FLSA allows individuals to sue political subdivisions of states. *See Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). We are confident, however, that Puerto Rico is more analogous to a state than to a state's political subdivisions, especially given the Supreme Court's interpretation of the Federal Relations Act, *see Examining Bd.,* 426 U.S. at 594, 96 S.Ct. 2264, and the FLSA's definition of "State," *see* 29 U.S.C. § 203(c). Indeed, our previous decisions extending Eleventh Amendment immunity to Puerto Rico rest in part on this premise—a premise that *Seminole Tribe* and its progeny do not discredit.

ment provision was to permit public employees to enforce the FLSA's prophylaxis to the maximum extent permitted by the Constitution. On this basis, one can surmise that Congress would have intended employees of Puerto Rico to be able to sue for overtime wages and the like, as long as it was constitutionally acceptable to do so, regardless of whether state employees were similarly entitled.

■ This argument has a certain superficial logic. Yet the context and circumstances recounted above—highly pertinent factors, according to the Supreme Court—forbid its use in this situation. Congress has advised us with uncharacteristic bluntness that it does not intend a generally applicable statute to regulate Puerto Rico to the full extent allowed by the Constitution unless it either specifically singles out Puerto Rico or imposes similar regulations on the states. *See* 48 U.S.C. § 734. In other words, it has instructed us to refrain from inferring that statutes which have limited effect upon the fifty states silently apply with greater force to Puerto Rico. *See id.* To cinch matters, strong policy considerations—especially those involving Congress's efforts to fulfill the promise of Federal Relations Act and to ensure Puerto Rico a degree of autonomy normally associated with the states, *see Examining Bd.*, 426 U.S. at 594, 96 S.Ct. 2264—counsel against reading the FLSA in a parochial fashion. *See Cordova & Simonpietri*, 649 F.2d at 42.

To sum up, there is absolutely no evidence that Congress intended to treat Puerto Rico differently than the fifty states for purposes of the FLSA's enforcement provision. Nor have the appellants identified any compelling policy reasons that might propel us towards such a result. Hence, in accordance with 48 U.S.C. § 734, we conclude that the language in the FLSA that courts have deemed insufficient to abrogate states' immunity is equally insufficient to undermine Puerto Rico's immunity. When Congress provided for suits by individual employees against public agencies "in any Federal or State court

of competent jurisdiction," it did not intend for that jurisdiction to encompass suits against Puerto Rico more readily than suits against the states. Indeed, it is inconceivable to us that Congress would have chosen to invoke the Territorial Clause to impose the FLSA on Puerto Rico had it known that it could not impose an equivalent burden on the fifty states.

Let us be perfectly clear. We do not gainsay that, under the Territorial Clause, Congress may legislate for Puerto Rico differently than for the states. *See Harris v. Rosario*, 446 U.S. 651, 651–52, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980). Here, however, we need neither speculate about that aspect of the matter nor attempt to map the outer limits of Congress's power under the Territorial Clause. We ground our holding in statutory construction rather than constitutional capacity: given the language of the FLSA, the context in which Congress amended it to reach public agencies, and the guidance provided by the Federal Relations Act, reading the law to intrude more profoundly on Puerto Rico's sovereignty than on that of the states would contradict what we discern to be Congress's manifest intent. To harmonize our reading of the statute with this intent and to maintain the parallelism that Congress sought to achieve, we construe the FLSA as failing to overcome Puerto Rico's immunity.

## IV. CONCLUSION

We need go no further. As a matter of statutory interpretation, we conclude that Congress had no intention to create an enforcement provision in the FLSA that treated Puerto Rico differently than the states. It follows that the FLSA does not effectually abrogate Puerto Rico's immunity and that the courts below appropriately determined that they lacked jurisdiction to proceed.

*Affirmed.*